This is a case of confusing apples with oranges. The crux of this matter is the ALJ's rejection of Dr. Parson's opinion, the treating psychiatrist. Dr. Parson's opinion, which appears at 329 of the record, considered the impact of Burky's mental impairments in a work setting. And according to the vocational expert at 55, Parson's limitations preclude work. Well, let me ask you this. Okay, so the ALJ, I think, basically discounted Dr. Parson's testimony because the ALJ believed that Parson's testimony was inconsistent with the overall record and with Dr. Trump's opinion and with the vocational expert's evaluation and with Parson's own notes, because Parson had some notes and then had a report. Why isn't that enough for us to affirm? Because Dr. Trump's opinion is actually, her opinion is actually consistent with Dr. Parson's opinions. Dr. Parson's notes are just that. They are notes taken in the doctor's office by a professional who is trained to put people at ease. And as were Dr. Trump's findings before she got to the opinion page. Well, now, Mr. Burky, obviously, he testified, correct? Yes. And he testified about the things that he's capable of doing and that he cooks four complete meals a week, which is more than some of us, but and then four simple meals. And so there was, the ALJ also compared what the ALJ considered that Mr. Burky could actually do relative to what the doctor's report said, right? Which isn't, isn't wrong. Well, it is all of that, all of the testimony and the doctor's notes and Dr. Trump's findings, they were all considering in a non-work situation. Each medical professional felt that when a Mr. Burky, while he could survive living in a cocooned apartment where she is generally afraid to leave, with his father keeping him, coming every day, feeding him, clothing him, actually it doesn't say clothing, feeding him, paying his rent. Didn't he say he would have gone out more than he did, except he didn't have a car? He would, the father was also transporting him. That is, the father was visiting every day and the father kept track of him. That is, that was a support system he had to stay in his house. The judge also felt it was inconsistent that a person with agoraphobia could live alone for eight years, but what the judge did not recognize was the impact of the father. And also, the office notes themselves consider Mr. Burky in a controlled environment, but when the report that Dr. Parsons wrote is entitled, Mental Ability to Do Work-Related Activities, and she is charged on that report form to state your opinions of the individual's cognitive limitations and their impact on the person's ability to engage in work full-time. That's the orange. And counsel, let me ask you this. Dr. Parsons' assessment that he had limited use of judgment and lacks the useful ability to function in a work environment, that assessment was based on the anxiety that she observed, the panic attacks, the agoraphobia that you mentioned. Is there anything in Dr. Trump's examination and notes that would contradict those findings in terms of his social impairment that would affect his ability to operate in a work environment? Did Dr. Trump comment specifically on that? Not in the findings of Dr. Trump, although she did find significant impairment in her diagnoses. But when she switches over to the last page, Dr. Trump's findings state, first of all, she stated that Mr. Burky is genuine and credible without exaggeration, and then she says Mr. Burky will, not may, will have trouble with sustained concentration, persistence, ability to carry out simple instructions, maintain attention and concentration, and maintain regular appearance, attendance, excuse me. That is the same findings of Dr. Parsons. So, excuse me, not findings, but opinions. So those, they're actually in agreement. The judge felt that Dr. Trump was vague. I suggest that a reasonable person looking at this would not find Dr. Trump vague. We also, when I posed to the vocational expert Dr. Parsons' opinions and Dr. Trump's opinions, I posed five hypotheticals. After each hypothetical, the vocational expert stated no jobs. And those were individual, on those individual factors. The judge posed one hypothetical, saying that there was a limitation in the ability to interact with people. Well, that isn't, that was one of the minor things. And that was it. No consideration of work environment. And what the ALJ, what the VE stated was that he could do his past work. On the other hand, the non-examining doctors found that he couldn't do skilled work. And his past work, he limited, they limited Mr. Berkey to unskilled work. And both of his past jobs, one was skilled and the other one was at least semi-skilled. So there is, since that was not included in the judge's one hypothetical, there were, the VE's testimony was he could do his past work, but he couldn't because of the findings of everybody in the file other than apparently the judge. And the judge did not inquire to alternative jobs. Do you have any other questions? If we don't appear to, do you want to reserve the balance of your time? Yes, please. Thank you. Thank you. Good morning. Good morning. May it please the Court and counsel, my name is Terri Shea and I'm appearing for the Commissioner of Social Security. Okay. Why don't you just pretty much cut to the chase on this and tell us how, I think the ALJ perhaps could have been a little clearer on certain points, but the pressure points that I'm looking at is how in the record did the ALJ explain why, was it a he or a she? She? The ALJ? I believe it was a Sam, so I believe it was a he. Okay. How he explained the differences in Dr. Parsons, Dr. Tromps and, you know, and put the evidence together in terms of coming up with adequately explained why he wasn't following Dr. Parsons and as far as that goes. And I think the ALJ also had sort of a thought that Mr. Berkey was credible on certain things, but not credible on others and how was that explained in the record in a satisfactory manner according to the law? Well, it's not the best written ALJ decision. It is a little strange where the ALJ first says, well, I think the activities of daily living don't help and I think the medical record doesn't help. And then he went into an explanation. Doesn't help what? Doesn't help his credibility. Doesn't help the, give credence to what he claimed his continuing limitations are. And part of what he did talk a little bit about, even though his father came over every day, that nonetheless this claimant was able to do a number of things and survive by himself. It's pretty brief, but it does go into some explanation of what then when you talk about medical improvement, this is all in the RFC component of the ALJ's decision. And where some cases have said, well, you have to just say everything you want to say about the claimant's credibility or now we're calling it inconsistency with the record that the ALJ probably could not have gone and included the evidence about Judge Parson's decision as part of the assessment of plaintiff's consistency or inconsistency with his claims. You know, it's the district court judge tried to help and basically said, well, I think the ALJ's clearly, Judge Trump and Judge, Dr. Trump and Dr. Parsons were inconsistent with regard to cognitive impairment. Well, but I think that's the problem with this case. The district court did try to help and made certain findings and inferences that the ALJ himself didn't. As you said, the explanation is very brief and there are many instances when that is more than sufficient given our deferential review. But the one area that our case law has been very consistent in requiring a further explanation is when the ALJ fails to give the treating doctor's opinions controlling weight. So getting to the pressure point that Judge Callahan explored with you, the treating doctor's note, Dr. Parsons, fairly consistent that he's able to function by himself on a certain level because he lives in an apartment and takes care of his own food needs, et cetera, but that he's always had pretty severe social anxiety. He rarely leaves the house. His panic attacks are really triggered when he's around other people. On the last examination when he saw Dr. Parsons, he left the house only once in the past month. So that kind of social anxiety and kind of inability to be in an environment where other people are around led then to her assessment that he had severe anxiety, panic attacks, and agoraphobia that would limit his ability to function in a work environment. The ALJ rejected that ultimate conclusion, but I don't know why. Is there an explanation in the record as to why the ALJ discounted Dr. Parsons' assessment that he is going to have limitations, severe limitations, in the work environment because his panic attacks are essentially triggered by being around people? And in answering that question, if you could focus on Dr. Trump, because there's some inconsistencies there that the district court observed, but I'm not sure I understand that either because Dr. Trump said that it's likely he would struggle in a work environment. Well, what the ALJ relied more on rather than inconsistency between Dr. Trump and Dr. Parsons was the plaintiff, Mr. Berkey's apparent improvement over time. And this was evidenced in Dr. Parsons' treatment notes, not in either of the two examining opinion or the Dr. Trump or Dr. Parsons, which was basically early on in the treatment period. Right, improvement in terms of GAF scores and his ability to function, but not improvement as far as I can tell in terms of social functioning skills. I mean, is this a situation, the bottom line in my mind is, is this a situation where the explanation under our case law is inadequate such that we have to remand for further factual findings? Well, you know, I recognize that our case law likes it to be more specific, likes the ALJ to be the one who gives the examples, but the reliance on the GAF score used to be relied on much more heavily by psychologists and psychiatrists. It's gone out of, or at least the American Association says they no longer recommend GAF scores because they are too subjective and they're too much of a- All right, but, okay, you're here defending the decision. I am. All right. So tell us how that can be best defended. Well, it can be best defended by saying that what the ALJ is looking at, the treatment notes and the improved GAF scores over time did show medical improvement. And that was the gist of his disagreement with Dr. Parsons' opinion, not so much the disagreement with Dr. Trump's opinion. In other words, Dr. Parsons looked at, you know, made this assessment in January of 2013 after she had been treating the claimant for several months. But over the next two years, you know, whether or not these lessened symptoms indicated probable lessened impairment in the workplace is a leap that the doctors make or the ALJs make based on their assessment. Okay, he's starting to be able to go out by his own more often. He has friends. He's walking in the public. These would seem to be lessened symptoms. And there's why, you know, I guess the assumption is if these are in the personal life, why wouldn't they translate to the workforce? It's kind of a, that is what the ALJ is assuming, that this is the kind of medical improvement. Right. But the problem is that the ALJ didn't explain it. So if, as you say, the improvement in GAF scores accounts for the inconsistency that the ALJ sees between Dr. Parsons' assessment and his testimony, that's not borne out by the record. Because I'm looking at the treatment notes that progressed from January 31, 2013. May 2013, she saw him. He'd had two anxiety attacks since his last appointment. And August 2013, his mood swings. He's not so stable. He's easily tearful. He doesn't want to meet people. November 2013, his mind is still racing, feeling worthless and hopeless. He's lost it twice, anxiety on and off. November 2014, a little bit better than normal. March 2014, same crap, different day. So there's consistency in terms of the panic attacks that doesn't seem to be alleviated. Do you have an explanation for that? Or does Dr. Trump have an explanation for that? Well, Dr. Trump also didn't see the subsequent treatment notes. And her assessment obviously was based on her meeting with the claimant the one time. The ALJ didn't say that her court feels the ALJ has to specify from the treating record. The GAF score is just one indicator within the treatment record. And certainly when the GAF score is favorable to the claimant, they will point to it. When the GAF score is more favorable to the Commissioner, the ALJ may point to it. But that's just one piece of information. The ALJ certainly could have and probably should have gone into more detail about each of these subsequent visits where the claimant himself says, I'm doing okay. I'm doing much better. And if in the same treatment note, he's also talking about that he's had some more panic attacks and he's had a couple of crying episodes, that those are things that should be equally weighed. The ALJ did point out that there was... Or at least explained. Sorry? Or at least explained under a case law. All right. Well, he did try to explain that, well, you have to look at whether or not he gave a fair assessment of these treatment notes. And he did recognize that there were positive signs that meant, went toward disability of panic attacks and crying or being irritable or stating he was depressed. But at the same time, it looked to the ALJ from those treatment notes that it was a kind of a steady, if slow, improvement over time. And when there was an exacerbation or the GAF score dipped a little bit, the treating doctor increased his medications. And then subsequently, the GAF score went more positive again. Of course, plaintiffs will say that this is an indescendence of waxing and waning. And these were just incidental or cherry-picked incidents where there was improvement in systems. But really, the ALJ kind of stepped back from that or tried to and said, look, I recognize that it dipped here. But then overall, it was going steadily in a positive direction. That is what he said. That is what he did. And it's where the court may decide that wasn't adequate. But, you know, you come down to what's substantial evidence. And most of our decisions have said that substantial evidence is enough evidence to support, say, convince a reasonable person that this was right. You have at least two people here who are reasonable people who believe that this was sufficient. That's where we are. All right. Unless the panel has any additional questions, I've taken a little bit over. All right. Thank you. Thank you. Could you answer a question for me? Yes, sir. When I first looked at this case, I was impressed with the work of the district court judge of being, I thought, very careful about how the district court proceeded with the process. And while there may be certain differences that there are, it seemed to me that the district judge did a very good job. In what way would you disagree with that? Where did the district judge go wrong in your view? He did not. Thank you. He did not consider the work environment factor. I'm sorry? He did not consider the work environment factor. This is not a Tomasetti case where you had a spinal disorder. That spinal disorder will appear one way in the notes and in the evaluation. It'll actually appear the same way as far as workability. Here we have a mental condition that changes, that transforms from in his prison of an apartment to the point that where he has to be in a competitive work environment. That's what the district court judge missed. But he was a painter, which you'd done before, and a stone polisher. That isn't exactly selling door to door. This is true, but you do have, and that would be the public interaction, but you do have to work in tandem with co-employees, and you also have to respond very quickly and very effectively with your supervisors. You also have to go out and earn a living, which is exactly what this guy's problem is. Well, he has a decent work history. Yes, he does. He has a decent work history, so that's some evidence of his ability. Until ironically, he quit drinking, which I found quite ironic in this file. He actually, you know, the alcohol issue is a big thing in what I do for a living, but he actually quit drinking, and then he couldn't handle anything else. Can you point that out? I'm sorry? In which doctor pointed that out, that that was a game changer? It's also in Trump. It's also in Parsons' notes. No, no, that this became a game changer, that he quit. Oh, the work history? I would suggest to you, sir, that both in Trump and in Parsons' opinion, where they switch from documentation of, like, office notes or findings in Trump's case, and then they go over to answer questions about how he would perform in the work history. That's where they're united. I would also say with credibility, everybody, there is no malingering in this case. There is no questions of credibility anywhere. Even the ALJ suggested that there was, that there was a, that he was being honest, thorough and, thorough and polite, I guess, is what he said. In any event, what the, what we have here is a failure to understand that the work environment changes, unlike a spinal case, where your spine doesn't change when you go to work. Well, is it that they failed to understand it, or that they saw it differently than you did? Because that, that makes a difference. I think the forms themselves call for a different thing, and they're not recognizing it. They failed to understand what those forms do. They're not notes taken in an office, cushy office. That's a big difference. You have somebody who's trained and paid to put you at ease so that you can, so they can treat you. That isn't what you have at the work site, and I have been at work sites. I can, well, I'm not going to, I think we all know that those work sites, particularly construction work sites, which both of those were, can be quite intimidating, certainly to somebody with panic attack disorder. When you say, we all know, you mean it doesn't have to be in the record? That's why I backed away from that, Judge. It's not in the record. It's a good idea to back away. Yes, ma'am. Yes, sir. All right. Well, we've taken you into overtime, unless there's additional questions. That'll wrap it up. Thank you. I appreciate it. All right. This matter will stand submitted. Thank you.
judges: Wallace, Callahan, Nguyen